# In the United States Court of Federal Claims

No. 17-2056C
(Filed Under Seal:  May 29, 2018)
Reissued: June 7, 2018[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | * |
| **OCTO CONSULTING GROUP, INC.,** | * |
| | * |
| Plaintiff, | * |
| | *  Post-Award Bid Protest; |
| v. | *  *Blue & Gold Fleet, L.P. v. United States,* |
| | *  492 F.3d 1308 (Fed. Cir. 2007); |
| **THE UNITED STATES,** | *  Protest Lacks Merit, Lacks Standing |
| | * Denial of Permanent Injunction |
| Defendant, | * |
| | * |
| and | * |
| | * |
| **ENTERPRISE SERVICES LLC,** | * |
| **SALIENT CRGT, INC., and** | * |
| **LOCKHEED MARTIN CORPORATION,** | * |
| | * |
| Defendant-Intervenors. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Aron C. Beezley*, Bradley Arant Boult Cummings LLP, Washington, D.C., for Plaintiff.

*Kelly A. Krystyniak*, Trial Attorney, *Chad A. Readler*, Acting Assistant Attorney General, *Robert E Kirschman, Jr.*, Director, *L. Misha Preheim*, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant; Of Counsel, *Charles G. McCarthy*, Assistant Regional Counsel, U.S. General Services Administration, Office of Regional Counsel, San Francisco, CA.

*Daniel R. Forman*, Cromwell & Moring LLP, Washington, D.C., for Defendant-Intervenor Enterprise Services LLC.

*Lawrence P. Block*, Reed Smith LLP, Washington, D.C., for Defendant-Intervenor Salient CRGT, Inc.

*Anuj Vohra*, Cromwell & Moring LLP, Washington, D.C., for Defendant-Intervenor

---

[1]  The original Opinion was filed under seal.  The parties have conferred as to the necessary redactions and those redaction have been made in this public opinion.  Redacted sections appear with brackets as follows: "[. . .]."

Lockheed Martin Corporation.

## OPINION AND ORDER

**DAMICH, Senior Judge**

On December 28, 2017, Plaintiff Octo Consulting Group, Inc. ("Octo") filed this post-award bid protest challenging the General Services Administration's ("GSA" or "Agency") award of contracts in connection with the Alliant 2 government-wide acquisition contract ("GWAC") under Request for Proposals No. QTA0016JCA003 ("The RFP" or "Solicitation").[2] The GWAC is a Multiple Award, Indefinite Delivery, Indefinite Quantity ("IDIQ") contract to provide information technology ("IT") services to a wide variety of federal agencies.  In its protest, Octo alleges that the GSA acted arbitrarily and capriciously, and failed to obey applicable laws and regulations when it improperly evaluated the proposals and awarded the contracts.  As a result, Octo requests that the Court grant it declaratory and injunctive relief and enter judgment on the administrative record in its favor.

The Court adopted the litigation schedule as provided by the parties and entered its scheduling order on January 5, 2018.  Pursuant to the scheduling order, the administrative record was timely filed on January 19, 2018.

Defendant-Intervenors, Enterprise Services LLC ("Enterprise"), Salient CRGT, Inc., ("Salient"), and Lockheed Martin Corporation ("Lockheed") (collectively "Defendant-Intervenors"), were granted leave to intervene on January 29, 2018, February 6, 2018, and February 26, 2018, respectively.

On February 9, 2018, Octo filed its motion for injunctive relief, declaratory relief, and judgment on the administrative record ("Pl. Mot.").  The United States ("Defendant") timely filed its response, partial motion to dismiss, and cross motion for judgment on the administrative record on March 2, 2018 ("Def. Resp."); Defendant-Intervenors filed their joint opposition. response, and cross motion for judgment on the administrative record ("Def.-Intervenor Resp.") on the same date.  Thereafter, briefing continued as scheduled and was completed on March 30, 2018.

On March 5, 2018, Defendant filed a motion to supplement the record ("Motion").  The Motion was not opposed and the Court granted the Motion.  A motion to strike was filed by Octo on April 3, 2018, with briefing concluding on April 16, 2018.  For the reasons set forth below, the motion to strike is **DENIED AS MOOT** in light of the following opinion.

---

[2] Five other related bid protests were also filed this in court and assigned to the undersigned.  *See OBXtek, Inc. v. United States*, Case No. 17-1849C; *Centech Group, Inc., v. United States*, Case No. 17-2031C; *Capgemini Gov't. Solutions LLC v. United States*, Case No. 18-3C; *Harris IT Services Corp. v. United States*, Case No. 18-24C; and *Dynetics, Inc., v. United States*, Case No. 18-481C.  Two of them have since been voluntarily withdrawn.  *See Harris IT Services Corp. v. United States*, Case No. 18-24C at ECF No. 17; *Capgemini Gov't. Solutions LLC v. United States*, Case No. 18-3C at ECF No. 47.

After careful consideration, and for the reasons set forth below, the Court **DENIES** Octo's motion for judgment on the administrative record and **GRANTS** Defendant's partial motion to dismiss and cross motion for judgment on the administrative record. The Court further **GRANTS** Defendant-Intervenors' joint opposition, response, and cross motion for judgment on the administrative record.

I.      Facts

   A.  The Solicitation

GSA first published notice of its intent to procure under the RFP in FedBizOps in January 2014. AR at 1. GSA made its first draft RFP public in March 2015, AR at 412, and received more than 900 comments regarding draft RFPs by December 2015. AR at 1891.

On June 24, 2016, GSA issued the RFP. AR at 1887. The RFP provided for a 5-year base period, one 5-year option period, and a total ceiling value of $50 billion for all task orders. AR at 1386, 1334. The RFP further provided that GSA would issue multiple awards to the top sixty highest-rated offerors on a best-value bases to "the highest technically rated offerors with a fair and reasonable price." AR at 1581-82. Offerors were to self-score their proposals in the following categories: relevant experience; past performance; systems, certifications, and clearance; and organizational risk assessment. AR at 1517-80. GSA would then verify the scoring during proposal evaluation. AR at 1582. Based on the offeror's answers, the scoring worksheet auto-calculated its score out of a possible 83,100 points. AR at 30306. In the event of a tied score, "all Offerors precisely tied at the 60th position [would] receive an award." AR at 1582. The awardees would then be permitted to bid on a series of fixed-price, cost reimbursement, time-and-materials, and labor-hour task orders to provide IT services to various federal agencies. AR at 1333. The contract would be known as the "Master Contract." AR at 1333.

Relevant to this protest are the evaluations under relevant experience under Project Service Code ("PSC") Group Relevant Experience – Cost-Reimbursement Contracts and Experience with Multiple Federal Customer, Meaningful Relationship Commitment Letters, and Price Evaluation.

   **1.  PSC Group Relevant Experience**

Offerors could possibly earn a total of 17,000 points for experience under traditional information technology projects, known as PSC Group Projects, RFP Section 5.2.2. AR at 2264. In order to score these points, offerors were required to submit verification documents under two methods, depending on the information available. AR at 1543-44.

RFP section L.5.2.2.1.1 provided the two methods of verifying relevant experience: (1) a Federal Procurement Data System Report ("FPDS Report"), combined with the statement of work, as verification, or (2) if an FPDS Report was either not available, incomplete, or inaccurate, an offeror could submit the J.P-2 Form describing the project and signed by the

project's contracting officer, corporate officer, or local official, a copy of the contract award document and any modifications, a copy of the contract statement of work, and, if applicable, documentation of the contract line items. AR at 1543-44. Simply put, an FPDS Report was required if possible; if it was not possible then the J.P-2 Form option with the contracting officer's signature was an available option in order to gain the base points for PSC relevant experience.

In addition to the possible 17,000 PSC project points, an offeror could earn additional points, per project, if an offeror could establish that the contract was of a particular size or complexity. AR 1673-74. This required that an offeror establish that the contract was either a multiple-agency award or a cost-reimbursement-type contract for each separate federal customer. AR at 1548-49. To verify the distinct sources of federal funding, RFP Sections L.5.2.2.2, L.5.2.2.3, and L.5.2.2.4 explicitly required the submission of an FPDS Report to award these points, *unlike the base points for the underlying PSC experience*. AR at 1547-48 (emphasis added). In other words, offerors had the option of the two methods of verifying relevant experience to earn base points, but in order to gain additional points the FPDS Report was required.

Specific to this protest is RFP Section L.5.2.2.3*,* "PSC Group Relevant Experience – Demonstrating Experience with Multiple Federal Government Customers," which provided in pertinent part:

> This additional scoring is only available for relevant experience projects performed as a prime contractor to the Federal Government.

> Federal Government Customer is determined by the Funding Agency ID identified within the FPDS Report . . .

> Verification must also be provided by attaching the FPDS Report that indicates the claimed Funding Agency ID.

AR at 1548.

Additionally, in a published answer and question session, a prospective bidder asked and the contracting officer responded to this provision: "[h]ow can we obtain credit from a unique funding source that does not have an FPDS Report or a Funding Agency ID? The Document Verification and Scoring Sheet only gives credit for unique Funding Agency IDs." AR at 1932. In its published response the GSA responded that, "[t]hat is correct. You must have an FPDS specifying the funding agency code. No exceptions." AR at 1932.

Of further relevance here is RFP Section L.5.2.2.4 PSC Group Relevant Experience Project with Cost-Reimbursement which stated:

> For a <u>maximum of Two (2)</u> PSC Group relevant experience projects submitted under L.5.2.2, the Offeror will receive additional points if the projects are <u>United States Federal Government Cost-Reimbursement,</u>

specifically any of the cost-reimbursement contract types specified under FAR Subpart 16.3.

This must be indicated by checking the appropriate box on Attachment J.P-2, Relevant Experience (PSC Group) Project Template, and by including a summary of what work was cost-reimbursement within the description field of the Attachment J.P-2, Relevant Experience (PSC Group) Project Template.

If one or more Task Orders, coded in FPDS-NG as a federal government cost-reimbursement contract-type among a "collection of task orders," is submitted as a single Project under an Indefinite Delivery Task Order contract, the Offeror may claim the maximum points for one occurrence of the two Cost-reimbursement Projects occurrences available.  For example, a maximum of 1,500 points out of the 3,000 total points under L.5.2.2.4 may be claimed. No more than one occurrence may be claimed within any single Project.

Verification must also **must be** provided by attaching the FPDS-NG Report that indicates a cost-reimbursement contract type. The verification method mentioned in *Section L.5.2.2.1.1(2)* shall not apply to this Section L.5.2.2.4. **An attached FPDS-NG Report verifying the submitted cost-type project is required for earing points in this section.**

AR 1548-49 (emphasis in the original).

## 2. Price Evaluation

RFP Section M.2 Basis for Awards, provided that award decisions:

will neither be based on the Lowest Price Technically Acceptable  (LPTA) nor Tradeoff.  With the best value continuum, FAR 15.101 defines best value as using any one or a combination of source selection approaches.  For the Master Contract, the <u>Highest Technically Rated Offerors with a Fair and Reasonable Price</u> will determine the best value basis for Master Contract awards.

AR at 1581 (emphasis in the original).

The RFP instructed that the Agency would evaluate whether the top sixty rated proposals proposed "fair and reasonable" prices, earning a rating of acceptable or unacceptable.  AR at 1581.  The Government Accountability Office ("GAO"), in a pre-award bid-protest regarding the price evaluation in this same procurement, opined that the price evaluation method provided in the procurement was reasonable as GSA would:

[E]valuate price for a variety of cost factors, including **direct labor rates for thirty-one categories at four different skill levels**.  Fairness and reasonableness

of those rates are **measured against a range for each separate labor category and skill level developed from historical data from the Department of Labor (DOL)** Bureau of Statistics (BLS). The government will also separately evaluate the fairness and reasonableness of an Offeror's **fringe benefits, general and administrative costs, overhead, and profit**. Moreover, the offerors must provide a **narrative explanation regarding the methodology used in computing the direct labor rate composite**, the indirect costs, and, if applicable, provisional billing rates and forwarding pricing agreements . . . . Failure to establish fairness and reasonableness on any one of these aspects may result in disqualification for award.

AR at 2758-59 (emphasis added). *See also* AR at 1594-1596 (RFP section discussing the same). In addition, offerors were permitted to propose rates outside of these ranges along with a detailed narrative explaining the rationale behind a lower or higher direct labor rate. AR at 1573.

Indirect labor rates, including fringe benefits and overhead costs were also allowable costs. AR at 2651. These rates would be analyzed for fairness and reasonableness against an offeror's most current Defense Contract Audit Agency/Defense Contract Management Agency (DCAA/DCMA) approved billing rates, forward pricing rate agreements, and/or acceptable accounting system generated rates for each of the 248 labor categories. AR at 1574. If an offeror did not have an approved DCAA/DCMA rate, the offeror could provide other rates along with a supporting rationale. AR at 1574. Indirect rates without a sufficient rationale would be rejected as unacceptable. AR 1574.

And finally, offerors were permitted to propose a profit not exceeding 7.5% for each labor category. AR 1574. Rates exceeding this amount required a supporting rationale. AR 1574.

## B. Pre-Award, GAO Protests, Agency Level Protests, and Award Recession

Eight protests[3] were filed before the GAO before the deadline for proposals and two were filed with the Agency. AR at 2297-2772. Out of the ten protests, two protests challenged the RFP requirement that an offeror submit an FPDS Report in order to gain bonus points for work performed. Four others challenged the price evaluation scheme. All protests were denied. AR at 2760-61.

On November 27, 2017, Octo filed with GSA a timely Agency-level protest. On December 21, 2017, GSA denied Octo's Agency-level protest.

In light of Octo's allegations in this protest, the Agency reviewed the technical score awarded to Dynetics, Inc. ("Dynetics"). After review, the Agency determined that it had wrongly awarded 500 points for multi-agency experience, since Dynetics did not submit an

---

[3] One protest was voluntarily withdrawn after GSA took corrective action. AR at 2305.

FPDS Report.  AR at 10489.  On February 22, 2018, the Source Selection Evaluation Team ("SSET") wrote a memo to the contracting officer, documenting the scoring error and subsequent reduction of Dynetics's score to 73,100.  AR Tab 1033.  Because Dynetics had been tied with two other offerors for the sixtieth award position, the scoring reduction resulted in the rescission of the award made to Dynetics.[4]  *Id.*  Because the rescission of Dynetics' award left sixty awardees, another award was not made.  AR at 1502.

## C.  Proposal Submissions, Evaluation, and Award

Octo timely filed its proposal in response to the RFP, along with 169 other offerors.  AR at 30306.  The SSET performed a technical evaluation of the 170 offers, selecting the top 61 rated proposed for price evaluation.  Ultimately, GSA awarded contracts to 61 offerors, with scores ranging from 83,100 to 73,600.  AR at 30306.  Among those awardees was Lockheed Martin Corporation, Lockheed Martin Rotary and Mission Systems ("Lockheed Martin"), AR at 30311.

### 1.  Octo's Notification and Debriefing

On November 17, 2017, GSA notified Octo that it had not been selected for award.  AR at 30531.  Octo had self-scored at 77,000, which included 500 points for PSC contract ("PSC 1-2") with multiple agency experience, 4,000 points for cost-reimbursable PSC projects, and 1,500 points for a PSC contract performed in a foreign location.[5]  AR 11715-20.  However, GSA deducted 6,000 points for an evaluated score of 71,000 for the reasons described below.  AR at 30533.

Octo submitted an FPDS Report for six of the seven contracts for which it claimed its experience with multiple federal government customers.  However, GSA deducted a total of 500 points for its PSC 1-2 contract stating:

> [i]n accordance with RFP Sec. L.5.2.2.3 PSC Group Relevant Experience - Demonstrating Experience with Multiple Federal Government Customers, the Federal Government Customer is determined by the Funding Agency ID identified within the FPDS Report.  In order to gain points in this area, the offeror is required to provide an FPDS report.  **Here, the Offeror failed to**

---

[4] Octo's amended complaint asserts that "the Administrative Record reveals that at least one offeror (Dynetics) received credit for PSC Group Relevant Experience Project – Multiple Agency Awards, even though it, too, did not submit an FPDS report."  Pl. Mot. at 35 (emphasis omitted).  Pl. Am. Compl. at 10 ¶ 35.  However, as set forth above, the Agency has subsequently corrected this scoring error on Dynetics' evaluation and rescinded the award made to them.  AR Tabs 1033-34.  Because this evaluation error has been corrected, Octo no longer states a claim upon which relief can be granted, and these portions of its amended complaint are dismissed pursuant to RCFC 12(b)(6).

[5] Octo does not contest the agency's deduction of the foreign location points.  *See generally* Pl. Mot.

**provide a FPDS report in connection with this PSC.**

AR at 30533 (emphasis added).

The Agency further deducted 4,000 points under PSC Group Relevant Experience Project with Cost-Reimbursement RFP section L.5.2.2.4.  AR at 30533.  For PSC 1-2, Octo claimed an additional 2,000 points under this section.  AR at 30533.  The Agency disallowed these points stating:

> For PSC 1-2, as noted above, Octo did not include an FPDS report and thusly 2,000 points are deducted.

AR at 30533.

For PSC 3-1, the Agency deducted 2,000 claimed points finding that:

> The FPDS report shows that the task order is Firm Fixed Price, and not cost reimbursement, and thus, 2,000 points are deducted.

AR 30533.

The Performance Work Statement for the subject task order also indicated that the project was firm-fixed price: "This Performance Work Statement (PWS) describes the firm-fixed price support services tasks required to support all aspects of the RCAS PD."  AR at 12286.

In all, the Agency deducted 4,000 points under PSC Group Relevant Experience project with Cost-Reimbursement.  AR at 30533.

## 2.  Price Evaluation Of Octo's Proposal

In accordance with the RFP, after the top rated 61 technical proposals were identified, the Agency undertook a price evaluation.  *See supra* Section I.A.2.  Specifically, the contracting officer ("CO") (1) reviewed thirty-one proposed labor categories, including four skill levels for each category, (2) reviewed the submissions and determined that each demonstrated a clear understanding of the work to be performed under the Master Contract, and (3) analyzed the Offeror's spreadsheets and determined whether they were "fair and reasonable" by comparing them to the DOL statistics.  AR at 30350.

Here, some of [ . . . ] rates were outside of the Department of Labor ranges.  AR at 30350.  These were separately evaluated by the CO who found them to be fair and reasonable.  AR at 30351.  As further provided by the RFP, the CO "analyzed each top-rated Offeror's proposed indirect labor rates (Fringe Benefits, Overhead, and G&A) for fairness and reasonableness against the Offeror's most current DCAA/DCMA approved billing rates, forward pricing rate agreements, and/or acceptable accounting system generated rates for each labor category."  AR at 30351.

In the course of reviewing the offeror price proposals, it was discovered that one offeror, Sevatec, Inc. ("Sevatec") had submitted a blank cost/price template. AR at 30352. The CO found that all of the required information was also included in its pricing narrative and, rather than disqualifying Sevatec for award, the CO sought a clarification and asked the offeror to confirm its pricing. AR at 30352. Sevatec complied.

## II.   Jurisdiction and Standard of Review

The Court has jurisdiction under the Tucker Act, 28 U.S.C. section 1491(b)(1). The Tucker Act, as amended by the Administrative Disputes Resolution Act of 1996, 28 U.S.C. section 1491(b)(1), grants this Court exclusive jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). Under the Tucker Act, an "interested party" includes an actual or prospective offeror whose direct economic interest would be affected by or which has suffered a non-trivial competitive injury or prejudice as a result of the alleged error. *Sys. Application & Tech., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

In a bid protest, the trial court "review[s] the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Pursuant to the standards set forth in the APA, the trial court determines whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. A procurement decision may be set aside "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). Further, a protester must demonstrate that there was a substantial chance it would have received the contract award, but for the alleged error in the procurement process. *Statistica Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

The Federal Circuit has held that challenges to the terms of a solicitation itself, as opposed to the evaluation of proposals responding to a solicitation, must occur prior to the deadline for receipt of proposals when these are based on alleged patent errors. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). A party's failure to do so is a waiver of its ability to raise the same objection in a bid protest action in this Court. *Id.* at 1313. "This doctrine was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact." *Id.* at 1313-14 (citing *Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1580 (Fed. Cir. 1993)).

Therefore, a preliminary question to address in considering Octo's protest is the nature of the challenge brought—in other words, whether the terms of the Solicitation itself, or the Agency evaluation of Octo's proposal, is being challenged.

III.     **Has Octo Waived its Right to Protest?**

*Blue & Gold Fleet*, teaches "that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in" this Court. 492 F.3d at 1313.  Moreover, an unsuccessful bidder may not re-write the solicitation to suit its needs in a post-award protest after sleeping on its rights before bidding.  *Id.* at 1314.  It is Defendant's contention that Octo's claims are "objections to the terms of the RFP under the guise of a post-award protest against the agency's evaluation."  Def. Resp. at 17.  Thus, to be timely, the protest must be filed pre-award.  *Id.*   In light of the fact that Octo is now before the Court post-award, Defendant asserts that Octo's claims are time-barred.  Def. Resp. at 16-23.

In contrast, Octo contends that it is not challenging the terms of the solicitation terms "but rather the government's unreasonable interpretation of the RFP and otherwise arbitrary conduct."  Pl.'s Reply at 3.  The thrust of its brief is that the Agency applied a formalistic interpretation of the RFP's FPDS verification method to it, yet "arbitrarily waived nonconformance with FPDS verification methods for another offeror."  *Id*.  Octo alleges that GSA's deduction of points were "based on form, rather than substance . . . predicated on an unreasonable interpretation of the RFP and is arbitrary."  *Id*. at 5.

On balance, the Court concludes that Octo is challenging the conduct of the Agency during the evaluation, not the terms of the solicitation.  The Court, therefore, disagrees with the government's characterization of Octo's challenge, and the challenge is timely as a post-award protest.

The Court must, therefore, address the merits of the protest, *i.e.*, were the Agency's actions reasonable?

IV.     **Octo's Protest Lacks Merit**

Octo raises five separate bases for this protest.  Specifically, Octo alleges that: (1) GSA wrongfully deducted 500 points from its self-score under the PSC group relevant experience—multiple-agency awards for PSC 1-2, (2) GSA wrongfully deducted 2000 points under the PSC group relevant experience—cost reimbursement for PSC 1-2, (3) GSA wrongly deducted 2,000 points under the PSC group relevant experience for PSC 3-2, (4) GSA engaged in unequal discussions, and (5) GSA wrongly awarded the Master Contract to Lockheed Martin.  The Court will take each in sequence.

   A.   **RFP Section L.5.2.2.3 PSC Group Relevant Experience Project –
        Multiple Agency Awards: GSA's Bonus Point Deductions were
        Reasonable**

Octo argues that GSA erroneously deducted 2,500 points because Octo did not provide FPDS Reports for its project PSC 1-2.  Pl. Mot. at 6.  Specifically, Octo argues that: "(1) [the] reports were unavailable due to the sensitive nature of the work performed under the subject

contract, and (2) Octo followed the procedures prescribed by the RFP for a situation in which an FPDS report was unavailable." *Id.* Furthermore, because Octo submitted seven projects under PSC Group Projects, RFP Section 5.2.2, and all seven projects captured the available points, by excluding the one project that did not have an FPDS Report the point deduction was arbitrary and capricious. Pl. Mot. at 7.

Octo relies on section L.5.2.2.1.1 of the RFP which provided that an offeror had two choices, rather than the filing of an FPDS Report for project verification. Instead, Octo asserts that it had a choice of either (1) filing an FPDS Report (L.5.2.2.1.1(1)), or if not available or accurate, by (2) submitting a contracting officer's signature (L.5.2.2.1.1(2)). Octo argues that by choosing the alternate method – L.5.2.2.1.1(2) – in lieu of an FPDS Report – L.5.2.2.1.1 – it should have been credited with the additional points. In support of this argument, Octo argues that the Agency "unreasonably focuses on the form—rather than the substance—of the submission." *Id.* Octo argues that by requiring an FPDS Report "GSA reads requirements into the RFP that do not exist." Pl. Mot. 7. It is Octo's interpretation that "the RFP contemplated awarding additional points . . . based on the substance of the offeror's submission under L.5.2.2, *not* a separate submission of an FPDS report." *Id.* (emphasis in the original). The Court does not agree.

RFP section L.5.2.2.3, PSC Group Relevant Experience Project – Multiple Agency Awards which provides in relevant part:

> This additional scoring is only available for relevant experience projects performed as a prime contractor to the Federal Government.
>
> Federal Government Customer is determined by the Funding Agency ID identified within the FPDS Report . . .
>
> Verification must also be provided by attaching the FPDS Report that indicates the claimed Funding Agency ID.

AR at 1548.

Here, unlike the base project points, which provided two options to capture points without an FPDS Report, AR at 1544-47, the RFP explicitly required an FPDS Report to capture the additional points. *See* AR at 1548-49 ("Verification must also be provided by attaching the FPDS report . . . ."). Furthermore, when asked during proposal preparation how an offeror could obtain credit from a unique funding source that does not have an FPDC Report of Funding Agency ID, the Agency replied unequivocally that an offeror must provide "an FPDS specifying the funding agency code. No exceptions." AR at 1932.

Moreover, this RFP provision was subject to a pre-award protest at GAO, with the GAO finding that:

> [T]he record supports the agency's position that assigning points to firms that can provide a FPDS report is reasonably related to the agency's needs .

. .

> Given that the acquisitions that will take place under the Alliant 2 GWAC
> are acquisitions that will be competed, awarded, and performed under the
> FAR, we find nothing objectionable with an RFP provision that provides an
> evaluation preference to contracts that were performed under the FAR.

AR at 2576, 2580-81.

Therefore, it is clear that the requirement for an FPDS Report was made explicit on the
face of the RFP.  It is further clear that when asked, the Agency was specific that an FPDS
Report was required to gain the additional points.  And lastly, the GAO pre-award protest
determined that assigning points to firms that could provide an FPDS Report was reasonably
related to the Agency's needs.  Thus, when the Agency evaluated Octo's PSC projects for the
possibility of capturing additional points, the Agency did exactly what it told the offerors it
would do: that in the absence of an FPDS Report, the Agency would decline to award the
multiple bonus points.  Here, the project that was deducted did not have an FPDS Report, as
required.  Therefore, the Agency's evaluation deducting 500 points was reasonable and in
accordance with the Solicitation.

> **B.  RFP Section L.5.2.2.4 PSC Group Relevant Experience Project –
>     Cost Reimbursement: GSA's Bonus Point Deductions were
>     Reasonable**

> **1.  PSC 1-2**

The Solicitation, RFP Section L.5.2.2.4 states:

> Verification must also **must be** provided by attaching the FPDS-NG Report
> that indicates a cost-reimbursement contract type. The verification method
> mentioned in *Section L.5.2.2.1.1(2)* shall not apply to this Section L.5.2.2.4.
> **An attached FPDS-NG Report verifying the submitted cost-type project
> is required for earing points in this section.**

AR at 1549 (emphasis in the original).  GSA deducted 2,000 points from Octo's self-score
relating to PSC 1-2 under this section for its failure to submit an FPDS Report.  AR at 30533.
Here, it is Octo's contention that: (1) the FPDS Report requirement could be satisfied by the
alternate J.P-2 verification method found under L.5.2.1 as evidenced by GSA's response to an
offeror's pre-award bid protest alleging that the FPDS requirement was overly restrictive, (2) by
requiring the FPDS Report the Agency unreasonably elevated form over substance, and (3) the
submission of the form was a minor informality that the Agency had discretion to waive.  Pl.
Mot. at 11-12.

A pre-award protest was filed with regard to the FPDS Report requirement contending
that the requirement was unduly restrictive.  AR at 2548.  It is Octo's contention that the GSA
response "interpreted the alternate verification method in L.5.2.2.1 as providing a basis to award

Case 1:17-cv-02056-EJD   Document 63   Filed 06/07/18   Page 13 of 19

points under L.5.2.2.4." Pl. Mot. at 11. Octo relies on a footnote in the Agency report filed in the pre-award protest of this contract. AR at 2551 n.5. That footnote provided:

> In the circumstance of a federal contract that was competed under the FAR (*i.e.*, with appropriated funds) but features **an inaccurate FPDS Report**, and the Offeror has submitted a J.P-2 for verification under RFP Section L.5.2.1 instead of (or in addition to) the FPDS Report, there is nevertheless a Funding Agency ID **and FPDS Report** associated with the project; those contracts may still receive credit under L.5.2.2.3 or L.5.2.2.4.

AR at 2551 n.5. However, contrary to Octo's assertion, the footnote clearly contemplated that an FPDS Report was required to capture the points. *See id.* (discussing the requirement of submitting an FPDS Report).

Thus, Octo's argument that somehow the Agency agreed that the FPDS Report is not necessary is without merit. The footnote clearly indicates that an FPDS Report was required. If there is any doubt as to what the footnote meant, the Agency report also stated:

> The evaluative elements at Sec. L.5.2.2.3 and Sec. L.5.2.2.4 allow points for Offerors who have performed for a multiplicity of federal customers and who have performed cost reimbursement contracts *under the strictures of the FAR* . . . .

> The Government enacts this element of the criteria by requiring verification through the existence of a FPDS Report . . . .

> [W]hen evaluating for experience with multiple federal agencies and cost-reimbursement contracts under RFP Sec. L.5.2.2.3 and L.5.2.2.4, however, the RFP seeks a demonstration that the Offeror has experience in competing for, being awarded, and successfully performing contracts which are subject to the governance of the FAR. Commercial projects, state government projects, and projects that are otherwise not subject to the FAR (and which therefore do no feature an accompanying FPDS) are <u>not</u> credited here.

AR at 2550 (emphasis in original).

It is clear that the plain language of the RFP states that the verification method found in section L5.2.2.1.1(2) shall not apply here. This was not a mere informality, it was a requirement. Yet, Octo strenuously argues to the contrary arguing that the "GSA's interpretation of the RFP [was] overly restrictive and arbitrary." Pl. Reply at 6. It is unclear to the Court how the Agency's interpretation was anything different than what the RFP made very clear: that in the absence of an FPDS Report, the Agency would decline to award the multiple bonus points. This is not unduly restrictive.

In order to prove this work, the Agency required the FPDS Report, which would show that the projects were competed, awarded, and performed under the same legal regimen. Thus,

Octo's other arguments are without merit.  The Agency administered the RFP and treated all offerors equally and fairly.  This fairness is an axiomatic principle in government acquisition, and, therefore, reasonably necessary to meet the Agency's needs.  As such, the Agency was not required to waive the requirement nor did the Agency unreasonably elevate form over substance.  Therefore, the Agency's decision to deduct 2,000 points was reasonable and in accordance with the Solicitation.

## 2.  PSC 3-1

GSA deducted 2,000 points from Octo's score in connection with Octo's PSC 3-1 submission because the FPDS Report submitted "shows that the [delivery] order is Firm Fixed Price, and not cost reimbursement."  AR at 30533.  It is Octo's argument that the Agency's evaluation finding the order as a firm fixed price order "unreasonably elevates form over substance and is otherwise arbitrary."  Pl. Reply at 6.  Octo further argues that the Agency engaged in unequal treatment of offerors by allowing the same 2,000 point bonus to another offeror, Agile Defense, Inc. ("Agile") despite it having submitted an FPDS Report not coded as a cost reimbursement contract.  Pl. Mot. at 17.

Octo argues that its order "clearly indicated that line items 00002 and 0004 were cost – reimbursement."  AR at 12173, 12275-86.  Pl. Reply at 6.  It indicates that in addition to the FPDS Report, the documentation submitted in support of the project stated that the Indefinite Delivery Indefinite Quantity ("IDIQ") contract was for a "Firm-Fixed-Price Task Order with Cost-Reimbursable Contract Line Item Number ("CLIN") for Travel and Other Direct Costs."  AR at 12183.  However, the two contract line items on the Firm-Fixed Price task order which Octo submitted for the project were cost-reimbursable: CLIN 0002, for travel costs, and CLIN 0004, a no-cost, mandatory reporting line item.  AR 12183, 12274-75.  Thus, Octo attempted to capture the bonus points for a single cost-reimbursable travel CLIN, capped at the amount of [ . . . ].

In contrast, Agile's FPDS Report indicated that its project was for "combination" work.  AR at 6838.  The supporting documentation also confirmed that the task order was for cost-reimbursement work, stating "this entire Task Order is cost type."  AR 6846.

The Court holds that the Agency's evaluation was reasonable.  Rather than putting form over substance, the Agency reasonably determined that Octo's single [ . . . ] travel CLIN was not sufficient to earn the reimbursable bonus points.  It is clear from the IDIQ Master Contract and the task order that the contract was one that was a Firm-Fixed-Price task order.

In contrast, Agile's task order, although indicated as a "combination" on the FPDS Report, clearly indicated that it is "cost type" allowing for the additional points.  Although the record is silent with regard to the Agency's actual review, in light of the Agency's conduct, clearly, it reviewed both offerors' packets and determined that while Octo claimed that its task order was a cost type contract, it did not in fact meet this requirement.

## C.  Price Evaluation was Reasonable

Octo "*does not* take issue with the 'terms' of the RFP." Pl. Reply at 15 (emphasis in the original). Instead, it takes issue with "the fact that GSA's actual price evaluation failed to comply with the FAR and CICA." Pl. Reply at 15. Octo further takes issue with the fact that GSA "overlooked errors in the awardees' price proposals." Pl. Reply at 15.

The Competition in Contracting Act, (previously referred to as "CICA") requires that "in each solicitation for competitive proposals, an executive agency shall . . . (B) include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals." 41 U.S.C. § 3306(c). The FAR requires that "the price or cost to the Government shall be evaluated in every source selection," FAR § 15.304(c)(1), but that an agency "can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches." FAR § 15.101. An agency has broad discretion to determine how it will evaluate price – and this discretion is even greater where, as here, an agency is making award on a best value basis. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (explaining that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone.").

Octo's argument seems to be that the Agency did not give price sufficient weight in its evaluation, thereby violating CICA and the FAR. Notwithstanding the FAR provisions above, Octo asserts that the Agency violated FAR § 15.404-1(a)(3) requiring that "[p]rice analysis should be used to verify that the overall price offered is fair and reasonable." *Id*.

Here, with regard to this RFP, in a GAO pre-award protest, the GAO decision found "nothing improper about the agency's price evaluation," and, specifically, that it did not violate the requirements of CICA. AR at 2758-59. As explained *supra* Section I.A.2, the GAO held that price evaluation was clear, and that the Agency would:

> [E]valuate price for a variety of cost factors, including direct labor rates for thirty-one categories at four different skill levels. Fairness and reasonableness of those rates are measured against a range for each separate labor category and skill level developed from historical data from the Department of Labor (DOL) Bureau of Statistics (BLS). The government will also separately evaluate the fairness and reasonableness of an Offeror's fringe benefits, general and administrative costs, overhead, and profit. Moreover, the offerors must provide a narrative explanation regarding the methodology used in computing the direct labor rate composite, the indirect costs, and, if applicable, provisional billing rates and forwarding pricing agreements . . . . Failure to establish fairness and reasonableness on any one of these aspects may result in disqualification for award.

AR at 2758-59.

Furthermore, the Agency's price evaluation followed the RFP. In other words, the Agency performed all of the tasks assigned to it. The Agency (1) reviewed thirty-one proposed labor categories, including four skill levels for each category and (2) the submissions and determined that each demonstrated a clear understanding of the work to be performed under the

Master Contract, as well as, (3) analyzed the offeror's spreadsheets and determined whether they were "fair and reasonable" by comparing them to the DOL statistics. AR at 30350. This is precisely what the RFP required.

Thus, Octo's assertion that the Agency here sought offerors for award of a "Master Contract," with awardees entitled to sub their rates on the high-end, but permitted lower rates for specific task orders, is without merit. AR at 1572-73 (discussing offerors' "ceiling" rates). The nature of this procurement – a Master Contract with unknown task orders to be issued in the future – precludes this analysis.

For the reasons discussed above, the Agency's price evaluation was conducted pursuant to the terms of the Solicitation.

### D. GSA Treated All Equally

"The acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for quotations or proposals to be revised or modified." *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 626 (2005) (citations omitted). "If the agency decides to award the contract after holding discussions, it must hold discussions with all responsible offerors within the competitive range." *Id*. (citations omitted).

It is Octo's contention that once GSA submitted comments to the various offerors permitting these offerors to incorporate these comments into a revised proposal, discussions were triggered. Once discussions were trigged, Octo claims that it should then have been permitted to revise and correct any deficiencies within its proposal. Pl. Reply at 23.

In this case, it is uncontested that after the proposals were submitted, GSA requested at least five offerors to revise their subcontracting plans. However, as the following cases demonstrate, subcontracting plans are properly part of a responsibility determination and these communications do not constitute discussions.

In *Consolidated Engineering*, the plaintiff alleged that the agency failed to conduct equal and meaningful discussions when the agency requested that the apparently successful offeror revise its subcontracting plan. *Consol. Eng'g Servs.*, 64 Fed. Cl. at 626. Like Octo, the plaintiff in *Consolidated Engineering* argued that once the agency submitted comments to an offeror on its subcontracting plan, and permitted that offeror to incorporate those comments into a revised subcontracting plan, discussions were triggered and the plaintiff was entitled to revise its proposal and correct any deficiencies therein. *Id*. at 627. The Court did not agree. Instead, quoting the FAR, the Court noted:

> FAR § 19.702(a)(1) provides that a subcontracting plan shall be required from the "apparently successful offeror," and states that said offeror shall be ineligible for award "[i]f the apparently successful offeror fails to negotiate a subcontracting plan acceptable to the contracting officer within the time limit prescribed by the contracting officer. FAR § 19.702(a)(1). Furthermore, FAR § 19.705–4 sets forth the additional requirement that "[t]he contracting

> officer must review the subcontracting plan. . . . and provides this instruction:
> In determining the acceptability of a proposed subcontracting plan, the
> contracting officer should take the following actions: . . . (7) Obtain advice
> and recommendations from the SBA procurements center representative (if
> any) and the agency small business specialist. FAR § 19.705–4(d).

*Id.* Therefore, relying on the FAR, the Court concluded that an agency's actions in requesting a subcontracting plan and negotiating with a bidder to ensure that the subcontracting plan was acceptable "was not only contemplated by the FAR, but required by it." *Id.* The Court further held that "subcontracting plan[s] relate[] to an offeror's responsibility, even where the solicitation requests the offeror submit the plan with its proposal." *Id.* at 627 (internal quotations omitted).

In *Dyncorp Int'l LLC v. United States,* 76 Fed. Cl. 528 (2007), this Court also held that that exchanges between an agency and offerors regarding responsibility determinations, including the analysis of the subcontracting plan, do not constitute discussions under FAR 15.306(d). *Id.* at 546-547. In this instance, the Court held, "[t]his court has approvingly cited GAO cases stating this rule to support a holding that exchanges concerning an element of responsibility such as a subcontractor plan do not constitute discussions." *Id. (*citing *Consol. Eng'g Servs.,* 64 Fed. Cl. 627; *Kahn Instruments, Inc.,* B–277973, 98–1 CPD ¶ 11, 1997 WL 811931 (Comp. Gen. Dec. 15, 1997); *A.B. Dick Co.,* B–233142, 89–1 CPD ¶ 106).

Applying the same reasoning, the Court holds that the GSA's communications regarding the subcontracting plans do not amount to discussions because the communications only concerned responsibility. Responsibility relates to the offeror's capability or ability to perform a contract. Responsiveness, by contrast, relates directly to the contractor's ability to provide the goods or services being procured. *Heli-Jet Corp. v. United States* 2 Cl. Ct. 613, 620 (1983). Thus, communications based on a responsibility determination in accordance with the FAR, does not open up discussions for other areas to include those related to responsiveness. Accordingly, the Agency acted properly when it did not allow Octo to revise its proposal.

The Agency also properly permitted offerors to correct clerical errors. An agency is permitted to engage in clarifications with offerors for the purpose of "eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1321 (Fed. Cir. 2003); *see also* FAR 15.306(a)(2) (clarifications serve to "resolve minor or clerical errors."). In contrast, "discussions" constitute "negotiations" between an offeror and an agency. *Info. Tech.*, 316 F.3d at 1321. Octo alleges that the Agency held discussions with Sevatec, asking it to correct a mistaken data entry.[6] However, all of the information that would have been included in that form was present elsewhere in its submission. AR at 30352. Because of the clearly erroneous omission, the Agency properly confirmed the already-submitted information with the offeror. *Id.* Hence, this did not trigger discussions. For these reasons, the Agency acted properly.

---

[6] In its reply brief, Octo alleges other unlawful communications with CenturyLink, CSRA, LLC, and Data Network, Inc., DBA/Data Networks Corp., that were not listed in its first brief. Octo has waived this objection by not raising it in its opening brief.

**E.  Octo Lacks Standing to Challenge Lockheed Martin's Award**

Octo alleges that GSA erred in crediting Lockheed Martin's proposal for resources that Octo claims were divested to another company.  Pl. Mot. 18-21.  In response, Defendant-Intervenors argue that Octo lacks standing to bring the action.  Def.-Int. Mot. at 2. Even if this Court finds that Octo does have standing, Defendant-Intervenors argue that the challenge fails both on the facts and as a matter of law.  *Id.* The Court agrees that Octo lacks standing; therefore, it need not address the merits of the challenge.

Standing is a "threshold" jurisdictional requirement.  *Myers Investigative & Sec. Servs., Inc., v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  A plaintiff contesting the award of a federal contract must establish that it is an interested party.  *Id.*  In the context of a bid protest under 28 U.S.C. § 1491(b)(1), the plaintiff must prove:  (1) that it is an actual or prospective offeror and (2) that it possesses "a direct economic interest."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  To establish a "direct economic interest, a [plaintiff] must show that it had a 'substantial chance' of winning the contract."  *Digitalis Educ. Sols., Inc. v. United States,* 664 F.3d 1380, 1384 (Fed. Cir. 2012).  In contrast, to establish prejudice, a plaintiff must "show that but for the error, it would have had a substantial chance of securing the contract."  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009); *see also, e.g.*, *Commissioning Sols. Glob., LLC v. United States*, 97 Fed. Cl. 1, 7 (2011) (dismissing certain allegations because, even if plaintiff succeeded on merits, plaintiff's "proposal would not have been improved and its chances of securing the contract would not have been increased."); *Octo Consulting Grp., Inc. v. United States*, 124 Fed. Cl. 462, 468 (2015) (dismissing protest challenging specific awardees in multiple-award procurement because, even if plaintiff prevailed on merits, it was not next in line for and would not have stood a substantial chance of receiving award).

Here, Octo lacks standing to challenge GSA's award to Lockheed Martin because, even if Lockheed Martin's award were set aside, Octo would not stand a substantial chance of receiving an award.  The Solicitation was clear that GSA intended to award a maximum of 60 Master contract awards and would only award more than 60 contracts if multiple offerors tied with the exact same point score at the 60th position.  AR at 152

Here, Lockheed Martin's final score placed it in the 55th position for award.  Three offerors tied with an identical point score at positions 59, 60, and 61;[7] and Octo's final score placed it in the 68th position, seven places outside of the award zone.  AR at 1582.  Given these rankings, Octo is unable to demonstrate competitive prejudice from any error in that evaluation. Regardless of GSA's evaluation of Lockheed Martin, there are seven other bidders who received higher scores than Octo but also were not awarded the contract.  Accordingly, Octo's challenge to any individual awardee is of no moment because Octo was not next-in-line for the award. Thus Octo lacks standing, and its protest of Lockheed Martin's award is dismissed.

---

[7] The 61st position, Dynetics, was eliminated after it was awarded the contract during the course of this litigation.  There remains only two entities tied for the 60th position.  However, Dynetics technical score still placed it ahead of Octo.

### V.        Denial of Permanent Injunctive Relief

In order to establish that it is entitled to permanent injunctive relief, the plaintiff must establish actual success on the merits.  The foregoing analysis reveals that there is no basis upon which to grant Octo's motion for judgment on the administrative record.  As such, Octo has failed to establish an entitlement to injunctive relief, *i.e.,* it has failed to show actual success on the merits.

### VI.       Conclusion

For all the forgoing reasons, Octo's motion for judgment on the administrative record is **DENIED** and Defendant's partial motion to dismiss and cross motion for judgment on the administrative record is **GRANTED**.  The Court further **GRANTS** Defendant-Intervenors' joint opposition and response and cross motion for judgment on the administrative record.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge

19